REAL ESTATE TITLE, INS. & TRUST CO. v. LEDERER, Collector of
Internal Revenue.

(District Court, E. D. Pennsylvania. February 23, 1916.)

No. 3646.

1. INTERNAL REVENUE ☞2—EXCISE TAXES—STATUTORY PROVISIONS—"BANK-
ER."

Act Cong. Oct. 22, 1914, c. 331, 38 Stat. 750, § 3, provides that bankers
shall pay a special tax of $1 on each $1,000 of capital employed; that, in
estimating capital, surplus, and undivided profits shall be included;
that every person, firm, or company having a place of business where
credits are opened by the deposit or collection of money subject to be
paid · or remitted, or where money is advanced or loaned on stocks, bonds,
etc., or where stocks, bonds, etc., are received for discount or sale, shall
be a "banker" thereunder. Held, that the statute is not void, as imposing
a direct tax upon the property of a banker merely because of its owner-
ship of such property, as the act does not tax property as such, but levies
a special license tax upon one engaged in a particular business, because of
the privilege he is exercising, and the fact, if true, that the amount paid
is the same as would be paid, had all the property of the banker been
taxed on an assessed value basis, is merely incidental and accidental.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. § 2; Dec.
Dig. ☞2.

For other definitions, see Words and Phrases, First and Second Series,
Banker.]

2. INTERNAL REVENUE ☞9—EXCISE TAX—QUESTIONS OF FACT.

What, if any, of the capital of a corporation engaged in banking and
other kinds of business, is employed in banking, within Act Cong. Oct. 22,
1914, is a fact to be found.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28;
Dec. Dig. ☞9.]

3. INTERNAL REVENUE ☞9—EXCISE TAXES—STATUTORY PROVISIONS—"CAPI-
TAL INVESTMENT"—"LIQUID INVESTMENT."

A corporation, engaged not only in the banking business, but also in
the title insurance and other kinds of business, kept entirely separate
from its other moneys a sum equal to its aggregate of deposits, and a
sum equal to the aggregate of its capital and surplus invested in chosen
securities, called "capital investments." Its capital investments were
invested in real estate and other investments of a less mobile · character
than investments commonly termed "liquid," while the deposits were in-
vested in securities which were more readily convertible into cash, and
these investments were kept separate from its other investments. It
from time to time put out statements of its financial condition, showing its
assets to consist of cash on hand, etc., and showing the aggregate amount
of its liabilities, in which were included, to balance the statement, the
amount of its capital stock, surplus, and undivided profits, which was not
less than the amount which measured the tax imposed on it under Act
Cong. Oct. 22, 1914, and paid by it. Held, that the facts did not show that
it did not use or employ any part of its capital in banking, and it was not
entitled to recover back such tax, as the character of a banker's invest-
ments can have no bearing upon the question of the amount of capital in-
vested in the business, and the capital, surplus, or undivided profits, either
separately or in a lump, cannot be segregated from a bank's other assets
and identified as such.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28;
Dec. Dig. ☞9.]

4. WORDS AND PHRASES—"EVIDENTIAL FACT"—"ULTIMATE FACT."

Facts are either "evidential facts," meaning facts which can be directly established by testimony or evidence, or "ultimate facts," which can only be deduced by inference from evidential facts.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Evidentiary Fact; Words and Phrases, First and Second Series, Ultimate Fact.]

5. TRIAL ⬅️136—QUESTIONS OF LAW OR FACT—EVIDENTIAL AND ULTIMATE FACTS.

Evidential facts, if in controversy, must be found by a jury, if the case is a jury case; but ultimate facts need not be submitted, if only one inference can fairly and reasonably be drawn.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 318, 320, 321, 323–327; Dec. Dig. ⬅️136.]

At Law. Action by the Real Estate Title, Insurance & Trust Company against Ephraim Lederer, Collector of Internal Revenue for the First District of Pennsylvania. On motion to take off nonsuit. Motion denied.

M. B. Saul and J. G. Johnson, both of Philadelphia, Pa., for plaintiff.

Gordon Auchincloss, Sp. U. S. Atty., of New York City, and Francis Fisher Kane, U. S. Atty., of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. In ruling upon the present motion, all other questions than the three following may be deemed to have been eliminated by agreement.

(1) The constitutionality of the act of Congress of October 22, 1914.

(2) The amount of capital which the plaintiff "uses or employs in its banking business."

(3) The right of the plaintiff to have this second question submitted to a jury.

Of these, in their order.

[1] The constitutional question raised is one which has been so fully discussed and considered in the cases already ruled that nothing more is called for than a statement of the conclusions reached. The point made on behalf of the plaintiff is that the tax which was collected is a direct tax upon its property, imposed upon plaintiff merely because of its ownership. If the tax is such a tax, the act of Congress, which imposes it, is admittedly void. The whole argument which makes for the unconstitutionality of the act is summed up in the asseveration that the principle upon which the Pollock Case, in 158 U. S. 601, 15 Sup. Ct. 912, 39 L. Ed. 1108, was ruled, condemns it. The ruling in that case was that a tax on the income derived from property merely because of its ownership is a tax on the property, and, in consequence, a direct tax, and whether an act of Congress levied such direct tax was to be determined by what the act did, not by what name the tax bore in the phraseology of the act. The application of the principle to the present act is based upon the averment that what this act does is to levy a tax upon the plaintiff in proportion to the value of its property merely because of its ownership of property to that value, and that this is a direct tax upon property.

The argument admits the power of Congress to impose a special license tax for what may be termed the privilege of engaging in any profession, calling, occupation, or business, and to determine the amount to be paid, either by the imposition of an arbitrary sum, or by the number of transactions had in a given time, or by the volume of the business or the product, or by the nominal capital employed, or in any way which is not the equivalent of a tax on the assessed value of what the taxpayer owns. The argument might further concede that a lawful tax could be imposed upon a corporation engaged in the banking business, with the license fee regulated in amount by the nominal capital of the corporation to which its nominal surplus might be added. When, however, its undivided profits are included, the tax is at once switched from an excise basis to a direct property tax basis. The thought may perhaps be most clearly presented by assuming (although this involves an almost absolute contradiction in terms) a corporation with all its assets employed in banking and having no liabilities. The tax imposed by this act would not differ in amount from a like tax imposed directly upon the property of the corporation assessed at the valuation which the corporation had itself placed upon its property.

The argument in support of the constitutionality of the act is in turn summed up in the answer to the propositions thus advanced. It is that the Pollock Case clearly distinguishes between incomes which are derived from the profession, calling, or business in which the taxpayer may be engaged, and the income which is derived from property solely by reason of his ownership of it, and gives recognition to a tax on the former as an excise tax. The same distinction holds good between a special license and a direct property tax. It is denied that what this act does is to tax property as such. On the contrary, what it does is to levy a special license tax upon one engaged in a particular business because of the privilege he is exercising. If it be true that the amount paid is the same as would have been paid, had all the property of the taxpayer been taxed on an assessed value basis, this is merely incidental and in a sense accidental, and does not indicate the identity of the two things done. The amount of the excise exacted is based upon the extent to which the taxpayer avails himself of his privilege. This is assumed (as it can fairly be assumed) to be measured by the amount of the capital which he has employed in the business. This capital is fairly defined by the amount of his own money which he employs in the business, and this, in turn, is defined by all there is in the business less what belongs to creditors. It, of course, happens that if a man employs his whole fortune as such capital the license fees he pays exactly equal what he would pay if a like direct tax were imposed upon the value of such fortune; but such likeness is no other, nor has it more significance, than the equality in volume or bulk between two entirely different things which have been subjected to the same measure. The words "capital used or employed" necessarily limit the tax to a special license or excise tax, and exclude any possible direct tax and were inserted for that purpose. The conclusion reached is that the act is constitutional.

229 F.—51

[2] As the constitutionality of the act thus turns upon the amount of capital used or employed, strict adherence must be given to this measure. This brings us to the second question. The difficulties which may be encountered in seeking to get a clear view of this branch of the case are due to failing to distinguish between the economic and the legal features of the question. The thought voiced in the phrase that a man may be engaged in banking without employing his entire capital in that business is intelligible, and lends itself to easy grasp, notwithstanding the fact that he is responsible for all obligations incurred, and the business in consequence has the credit given by his whole fortune. The same thought may be transferred to a corporation without losing in clearness. Indeed, banks and trust companies afford us a practical illustration of the difference between capital employed and a credit thus given, which in the economic sense is doubtless additional capital. All of them may have, and we know some of them do have, behind them the added credit of the personal liability of stockholders. No one, however, would think of adding this to the capital used or employed in the legal sense of these words. It is conceivable that the banking business may be carried on without any capital, in the sense in which the words "capital, surplus, and undivided profits" are used in this act. We have many living proofs of this in the plan of organization of savings banks. Indeed, this very act gives congressional recognition of the existence of such institutions.

This phase of the question may be dismissed with the remark that whether a given banker (whether a natural person or a corporation) uses or employs any capital, or the amount of it, is a question of fact, to be found as is any other fact. Inasmuch as all practical—and, indeed, possible—profitable banking involves the thought that all moneys, not required to make settlement with its customers, be kept invested, it is very difficult to grasp the significance of the thought intended to be conveyed by a statement of the fact that the moneys of the bank are invested. And, further, inasmuch as a bank (unless restricted by law to special forms of investment) may invest its moneys as it pleases, it is more difficult to see any room for difference of liability to the payment of the excise tax between bankers, one of whom invests his moneys in municipal bonds, and another who invests in commercial paper or any other form of lawful investment. If any question were raised here of whether this plaintiff was a banker within the meaning of this act, what he did would, of course, bear upon what he was; but this act contains its own definition of a banker, and it is admitted the plaintiff is one. This admission would seem to carry with it that what plaintiff did was banking, and to have no other significance than the other fact that it did other things besides banking. What, if any, of its capital is employed in banking, again, is a fact to be found and will be considered in connection with the third question.

[3] The final stand taken by the plaintiff upon what is really its chosen ground of defense is based upon a distinction which is more difficult to keep clear than the others. This plaintiff is in the strong-

est possible position to urge this defense. It has consistently treated itself as a trustee for depositors in its banking department, and has scrupulously kept a sum equal to its aggregate of deposits as entirely separate from its other moneys as a trustee could keep the moneys of his cestui que trustent separate from his own moneys. It has likewise kept a sum equal to the aggregate of its capital and surplus invested in chosen securities, which it has called "capital investments," or by an equivalent name. Based upon these facts, it lays claim to the benefit of the principle of exemption from taxation which it asserts to have been applied in the cases of Central Trust Co. v. Treat (C. C.) 171 Fed. 301, and Treat v. Farmers, 185 Fed. 760, 108 C. C. A. 98.

If the principle there applied is as broad as it is claimed to be, and can be upheld as law and is applicable, it undoubtedly rules the present case in favor of the plaintiff. It is confidently asserted that the rule established by these cases is that, if the moneys received from depositors are kept separate from the other moneys of the bank and are invested in securities which are likewise kept separate from the other investments of the bank, and no more in amount of the moneys of the bank are invested in commercial paper by discount or purchase than is represented by the investments made of deposit moneys, the other moneys of the bank being invested in so-called permanent (whatever this may mean) forms of investment, then the legal inference is that no part of the capital of the bank is invested in banking except the sums which may have been spent for a banking house or banking fixtures and the like.

We do not understand any such principle to be deducible from the rulings in the cited case. There are, it is true, some expressions in the opinions accompanying the rulings which supply plausible support to the argument of counsel for plaintiff. As has been often remarked, however, opinions are to be read in the light of the facts of the case to which they relate. The cited case was decided as a case stated, the facts being stipulated. It, moreover, arose under a different act of Congress. The agreed fact was that the capital of the bank in that case was invested in securities which had no relation to banking, and that all the funds of the bank which were in any way used or employed in banking were moneys belonging to depositors, and that no part of the capital or surplus of the bank was so used or employed. It was no part of the duty of the court—indeed, it was powerless—to change the effect of the stipulation. The agreed fact being that the banking business was carried on without any capital being employed, the court could not do otherwise than rule that no tax was payable. This is a very different thing from ruling as a matter of law that, if some of the moneys of a bank were invested in commercial paper, and some in other forms of investment, and if the aggregate investments in commercial paper do not exceed the aggregate sum owing to depositors, no part of its capital is used or employed in banking.

There are at least two seemingly unsurmountable obstacles in the way of reaching such a conclusion. One is how the character of the investments in which the banker puts his money can make any dif-

ference. As already observed, what he did might go to the question of whether he was a banker, if that were an open question. If he were a private individual, what he did with his money might have an important bearing upon the question next discussed of the evidence of the fact of what he had put into the banking business. It must be, however, that granted one is a banker and has money in the banking business, the character of the investments he makes of these moneys can have no bearing upon the question of the amount of capital he has invested in that business.

The other obstacle is the utter impossibility of its being held as a matter of law that the capital, surplus, or undivided profits of a bank, either separately or in a lump, can be segregated from its other assets and identified as such. The loose phrases in common use which might seem to imply such a possibility it is well understood do not. A bank or trust company might be said to have invested its surplus in the erection of a banking house or an office building. Every one understands that all that is meant by this is that it has so invested a sum equal to a certain part of its estimated ac umulated profits. Surplus, and kindred words, are nothing more than banking expressions. It is certainly clear that in no legal sense can either capital or surplus be earmarked as a concrete thing. The answer to the retort of counsel that "this company plaintiff not only can do it, but has done it," is an obvious one.

[4, 5] This brings us to the final question: Should the case have been submitted to the jury to find the fact of how much capital the plaintiff used or employed in its banking business? We have deferred certain features of the second question to be discussed in connection with this. There are certain questions which provoke the comment that they are mixed questions of law and fact. This expression is of more seeming than real clarity. A more clarifying and helpful classification of facts is into evidential and ultimate facts—meaning facts which can be directly established by testimony or evidence, and facts which can only be deduced by inference from such evidential facts. Evidential facts, if in controversy, must be found by a jury, if the case is a jury case. Ultimate facts need not be so submitted, if only one inference can fairly and reasonably be drawn.

When this case was called for trial, it was stated by counsel that the question involved was probably a question of law, as the facts were not in dispute. This meant that the trial judge should direct a verdict for plaintiff or defendant. In the judgment of the trial judge, this would have been a proper disposition of the case. At the close of the plaintiff's case the defendant moved for a nonsuit. The logic of the argument seemed to be good that, if the plaintiff was not entitled to a verdict, it had failed to make out a case and could properly be nonsuited. A nonsuit was accordingly awarded.

Plaintiff is in consequence entitled to every inference which can fairly and reasonably be drawn from the facts in evidence. A recapitulation of them involves some repetition, but seems to be helpful to the disposition of the case:

(1) The plaintiff was not only engaged in the banking business, but in the title insurance and other kinds of business unnecessary to enumerate.

(2) It kept, as already stated, the funds it received from depositors separate from its other moneys.

(3) Some of its funds, which it called its capital investments, were invested in real estate and other investments of a less mobile character than investments which are commonly termed "liquid."

(4) The moneys which it received from depositors it invested in securities which in its judgment were more readily and easily convertible without loss into what is called cash.

(5) The investments which are classified as (4) were kept separated from its other investments.

(6) It kept its accounts in such a way as to show, and from time to time made up and put out statements of, its financial condition, by which it appeared that it possessed assets consisting of cash on hand, obligations of borrowers, shares of stock and bonds of corporations, bonds and mortgages, ground rents, real estate, and other property of a given aggregate supposed value (as well as like property held by it as collateral), and showing, also, the aggregate amount of its debts and other liabilities. This statement was balanced by including along with its liabilities the amount of its capital stock, its surplus, and undivided profits. The latter was the equivalent of the balance of its profit and loss account. The aggregate of capital, surplus, and profits was admitted to be not less than the amount which measured the tax it had paid and was seeking to recover back.

From any one of these facts, or from all combined, could it be fairly and reasonably found that the plaintiff did not use or employ any part of its capital in banking?

This opinion has already been drawn out to such length that we do not feel called upon to add any observations, except to the three features the fuller discussion of which was deferred to this place. These are the fact that the plaintiff was engaged in other business than banking, the fact that it invested its moneys in different forms of investments, and the fact that it kept its deposited moneys and investments made of them separate from its other moneys and investments. As already observed, if a man say of a fortune of $1,000,000 were to establish himself in several different kinds of business, and were to put $100,000 into his bakery business and $100,000 into the banking business, it must, we think, be conceded that as a banker he would be liable to the tax measured only by $100,000 invested capital, notwithstanding his personal liability for its debts. If, however, he appointed agents to run his banking business for him, and left with them all its assets, and put out statements showing the amount of the capital of that business to be $100,000, he would be liable to a tax measured by that capital, notwithstanding that he had authorized his agents to also do a real estate and brokerage business, and no matter in what form of investments the moneys of the business were kept, and in spite of the fact that the moneys of the business which came

from deposits were separately entered. If the business were turned into a partnership, or were incorporated, the tax would under like conditions be the same.

The motion to take off the nonsuit is denied.